**The DON WEBSTER COMPANY, INC., Plaintiff,**

v.

**INDIANA WESTERN EXPRESS INC., Defendant.**

**No. IP99–1611–C–B/S.**

United States District Court, S.D. Indiana, Indianapolis Division.

Aug. 24, 2001.

---

James A. Dressman III, Deters, Benzinger & Lavelle, Covington, KY.

Robert L. Browning, Scopelitis, Garvin, Light & Hanson, Indianapolis, IN.

***ENTRY GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT***

BARKER, District Judge.

Plaintiff, The Don Webster Company, Inc. ("Webster"), sues Defendant, Indiana Western Express, Inc. ("IWX"), for breach of contract. In its Answer and Affirmative Defenses to Plaintiff's Amended Complaint ("Answer"), IWX asserts a number of affirmative defenses, including accord and satisfaction, payment, and release. On October 2, 2000, Webster moved for partial summary judgment concerning the above-named defenses. On that same date, Defendant filed a cross-motion for summary judgment on the defense of accord and satisfaction. These motions are fully briefed. For the reasons set forth below, the Court *GRANTS* in part and *DENIES* in part the Motion for Partial Summary Judgment of the Plaintiff, and *DENIES* Defendant's Motion for Partial Summary Judgment.

In addition, during the course of briefing on the cross-motions for summary judgment, IWX filed its Motion to Strike Plaintiff's Statement of Undisputed Material Facts in Support of its Response to Defendant's Motion for Partial Summary Judgment. For the reasons explained below, IWX's Motion to Strike is *DENIED*.

### Background Facts

Webster, a Kentucky corporation owned by Don Webster and Kimberly Webster, sells the transportation services of trucking companies to various shippers. Plaintiff's Facts, ¶¶ 1–2. IWX is a trucking company incorporated in Indiana.[1] *Id.* ¶ 3. Webster and IWX began doing business with each other more than six years ago. On April 5, 1995, they entered into a Commission Sales Agent Agreement ("Commission Agreement") establishing that Webster would sell IWX's trucking services to third parties on a commission basis. *Id.* ¶ 5. Paragraph 8 of the Commission Agreement stated that "[t]he parties agree that commission will be paid at $50.00 per load in the winter loads, with summer loads being paid at $100.00 per load." "Winter loads" are loads shipped from October 1 to March 31, and "summer loads" are loads shipped from April 1 to September 30. *Id.* ¶ 7.

Until 1997 and 1998, IWX and Western had a presumably productive and cooperative business relationship conducted under

---

1. The Court has jurisdiction over this case pursuant to our diversity jurisdiction, 28 U.S.C. § 1332.

the terms of the Commission Agreement. For instance, in December of 1995, Webster brought some shipping accounts from Fresh America's business to IWX. *Id.* ¶ 25. Until April of 1998, IWX paid Webster the rates established in the Commission Agreement. In addition, the parties also negotiated terms for certain accounts that were different from those set out in the Commission Agreement. As an example, Don Webster and Myron Cohen, an IWX employee, agreed to modify the commission terms on IWX's contract with The Gap, a clothing retailer. *Id.* ¶ 17. Under the terms of the modified agreement, Webster was to be paid $50.00 or $25.00 per load, depending on the route, for The Gap shipments. *Id.* ¶¶ 18–19. Webster and IWX later modified The Gap agreement again so that Webster's commission was based on the mileage of the route. *Id.* ¶ 20.

The souring of the relationship between Webster and IWX began in September of 1997 and continued through the formal termination of the Commission Agreement on September 3, 1999. *Id.* ¶¶ 11, 30. In May of 1997, Webster sold IWX's trucking services to Kroger, a supermarket chain. *Id.* ¶ 28. The Kroger loads shipped beginning in May and continuing until the end of September were "summer loads," and therefore, the Commission Agreement provided that Webster was entitled to a commission of $100.00 per load. Webster received payment from IWX at that rate until September of 1997 when he began receiving $25.00 per load on the Kroger account. *Id.* ¶¶ 29–30. He continued to receive payment at this lower rate until January 1, 1999 when IWX ceased paying Webster on the Kroger account entirely. *Id.* ¶ 31. In addition, in September of 1997, payments to Webster were adjusted so that Webster received only $25.00 per shipment for all previous Kroger loads. *Id.* ¶ 30. The parties' explanations of how Webster came to receive payment at a lower rate for the Kroger account differ a great deal. They are also crucial to this lawsuit so we will set out in detail the parties' respective narratives.

On one hand, Defendant claims that Don Webster attended an IWX open house in the spring of 1996. Defendant's Statement of Additional Material Facts, ¶ 57. In his deposition, Steve Coulter, President and majority shareholder of IWX, testified that at this open house, he and Don Webster agreed that a different contractual arrangement would govern volume accounts, which were the only type of accounts in which IWX was interested at the time. Coulter Depo. at 40–43, 73–74, 96, 122–23. Coulter maintains that he and Don Webster agreed that the commission rate either would be $25.00 per load or would be based on mileage, depending on the quality of the customer and the rate levels that were to be put in place. *Id.* at 75, lines 10–17; 96, lines 16–19.[2] The parties acknowledge that, at the time of this conversation, neither IWX nor Webster did business on the accounts now in dispute. In other words, Kroger was not a customer until a year later. Plaintiff's Facts, ¶ 28. According to Defendant, the Kroger account was a volume account and, therefore, Webster's rate on this account was $25.00 per load. Defendant's Answers to Undisputed Material Facts, ¶ 29.

Plaintiff, on the other hand, maintains that Don Webster never attended or even was invited to the IWX open house held in the spring of 1996. Plaintiff's Response to Defendant's Additional Material Facts,

---

**2.** More details of Coulter's testimony regarding the IWX open house are included where necessary in the legal analysis that follows.

¶ 57 (citing Webster Depo. at 206, lines 9–23; 166, line 20–167, line 1).[3] Instead, Webster has a different explanation of how the rate became $25.00 per load in September of 1997. According to Plaintiff, on August 22, 1997, Don Webster sent a fax to Rhonda Bussard, the administrative assistant to Coulter. Coulter Depo., Ex. 4.[4] In the fax, Don Webster asks Bussard to check IWX's records for certain loads for which Webster's records indicate non-payment. *Id.* According to the deposition testimony of Don Webster, he spoke with both Coulter and Bussard on the telephone about this subject in August or September of 1997. Webster Depo. at 136–38. Plaintiff further maintains that, during these conversations, Coulter said that a review of IWX's records indicated that Webster had not been paid for certain loads and that Webster had been paid too much on the Kroger loads. *Id.* at 137. Webster testified that he had an in-person meeting with Coulter in September of 1997 in an effort to deal with the problems revealed by the conversations related to his fax. *Id.* at 138–41. According to Webster, at this meeting, Coulter instituted a retroactive rate cut on the Kroger account to $25.00 per load. *Id.* at 140–44. In contrast, Coulter maintains that the rate on the Kroger account had always been $25.00 per load and that if Webster had been receiving $100.00 per load, it was only because Bussard had been paying him the higher amount in error. Coulter Depo. at 71.

Regardless of how the rate for the Kroger loads came to be $25.00 per load, the parties do not dispute that Webster continued to be paid at this rate for Kroger loads until January 1, 1999. Plaintiff's Facts, ¶ 31. This same rate was used for commissions on the Dole account brought in by Webster in February of 1998. *Id.* ¶¶ 40–41. Webster received weekly checks accompanied by Agent Settlement sheets itemizing the basis of payment. Defendant's Facts, ¶¶ 18–19.[5] From the settle-

---

**3.** Since Coulter's deposition testimony is evidence that Don Webster spoke with him at the open house, for the purpose of deciding Plaintiff's summary judgment motion, the Court accepts as true that Don Webster attended the open house and spoke with Coulter there. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (in deciding a motion for summary judgment, court must construe all facts and draw all reasonable and justifiable inferences in favor of the non-moving party).

**4.** Plaintiff cites the deposition of Bussard as evidence that Don Webster contacted Bussard. Plaintiff's Facts in Response to Defendant's Motion for Partial Summary Judgment, ¶ 2. However, Webster's submissions do not include a copy of the cited portions of the transcript. Defendant makes the same error with respect to the deposition of Danny Knactal, another IWX employee. *E.g.*, Defendant's Additional Facts on Reply, ¶ 4. Because cross motions for summary judgment are before the Court, where the parties do not dispute the content of the cites of the missing depositions, the parties' errors do not pose problems to

our inquiry. Where, as here, the parties do dispute the facts for which the missing depositions are cited, the Court has rejected the fact presented by the party but unsupported by a citation to the record unless our diligent search of the record revealed another source offering support for the disputed fact.

**5.** Defendant asks the Court to accept its facts as true and to strike Plaintiff's Facts in Response to Defendant's Motion for Partial Summary Judgment. Motion to Strike, ¶¶ 2–3. When Webster filed its response to Defendant's summary judgment motion, Plaintiff did not respond to the numbered paragraphs in Defendant's Facts. Instead, Webster filed an additional statement of facts and numbered the facts beginning with 1. Local Rule 56.1(f) requires Plaintiff to respond to Defendant's Facts and then begin numbering any additional facts with the next number after the last numbered fact in Defendant's Facts. While Plaintiff failed to follow the local rule, the Court does not grant IWX's requests. Webster eventually responded to Defendant's Facts, and misnumbering is not an egregious

ment sheets, Webster was able to tell the rate at which he was paid per load on all accounts, including the Dole and Kroger accounts. *Id.* ¶ 20. In addition, Webster cashed all of the checks issued for payment at the rate of $25.00 per load on the Dole and Kroger loads. *Id.* ¶ 22.

Now, Webster sues for payment on the Dole and Kroger loads at the rate of $50.00 per winter load and $100.00 per summer load rather than the rate of $25.00 per load. Webster also sues for payment at the rate set forth in the Commission Agreement for Fresh America and Wal–Mart accounts.[6] IWX shipped for Fresh America from December of 1995 to October of 1998. Plaintiff's Facts, ¶ 26. After April of 1998, Webster was paid for Fresh America loads at the rate of $50 .00 per load although Plaintiff maintains that it should have been paid the summer rate of $100.00 per load for loads shipped between April and October. *Id.* ¶ 27. In November of 1997, Webster arranged for IWX to ship for Wal–Mart. *Id.* ¶ 34. A minimal number of loads were hauled by IWX for Wal–Mart at that time. *Id.* In June of 1999, IWX began hauling for Wal–Mart again but has not paid Webster a commission for any of these loads. *Id.* ¶ 39. In response to the suit, IWX claims the defenses of accord and satisfaction, release, and payment. The summary judgment motions we address here pertain to these defenses.

## Summary Judgment Standard

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted if the designated evidence shows that there is no genuine issue as to any material fact and that the moving party. is entitled to summary judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). The moving party may meet its burden of demonstrating the absence of a triable issue by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party opposing a well-supported summary judgment motion may not simply rest on the pleadings, but must respond affirmatively with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). In deciding a motion for summary judgment, courts must construe all facts and draw all reasonable and justifiable inferences in favor of the non-moving party. *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505; *Shank v. William R. Hague, Inc.,* 192 F.3d 675, 681 (7th Cir.1999). Nonetheless, the "mere scintilla of evidence in support of the plaintiff's [or the defendant's] position will be insufficient" to avoid summary judgment. *Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. 2505.

## Analysis of Defenses

### Defense of Accord and Satisfaction

▮ In response to Webster's claim of underpayment on the Dole and Kroger

---

violation of the local rule. Furthermore, both parties did a considerably better job of complying with Local Rule 56.1 than many other litigants do. Happily, both IWX and Webster routinely cited to the record and avoided argumentative statements of "fact"! The Court *DENIES* Defendant's Motion to Strike for the reasons stated above.

**6.** Plaintiff further sues for payment on other disputed loads. For instance, the Commission Agreement, ¶ 11, provides that if IWX terminates the agreement, IWX will continue to pay full commission rates for the six month period following the notice of termination on all of Webster's accounts. Plaintiff claims that it has not been paid for loads shipped during the six months following September 3, 1999 when IWX terminated the agreement. These and other disputed loads are not relevant to the instant motions and will not be discussed further.

loads, IWX asserts the defense of accord and satisfaction.[7] Answer, ¶ II, 3. "An accord and satisfaction is a contract between the parties in performance of terms other than those originally agreed upon and in satisfaction of the parties' original obligations." *Fifth Third Bank of Southeastern Indiana v. Bentonville Farm Supply, Inc.*, 629 N.E.2d 1246, 1249 (Ind.Ct. App.1994) (citation omitted). The term "accord" means "an express contract between two parties by means of which the parties agree to settle some dispute on terms other than those originally contemplated, and the term 'satisfaction' denotes performance of the contract." *Mominee v. King*, 629 N.E.2d 1280, 1282 (Ind.Ct.App. 1994) (citation omitted). Accord and satisfaction generally refers to the acceptance of a check tendered and accepted as payment in full of a disputed claim. *Id.* at 1282–83 (citing 1 Am.Jur.2d *Accord and Satisfaction* § 21, at 320). For accord and satisfaction to apply, the claim must be the subject of a good faith dispute, rather than a liquidated and fixed claim. *Gearhart v. Baker*, 393 N.E.2d 258, 260 (Ind.Ct.App. 1979). The terms originally agreed upon by Webster and IWX were payments for summer loads at the rate of $100.00 per load and for winter loads at the rate of $50.00 per load. Plaintiff's Facts, ¶ 6. IWX argues that there was an accord and satisfaction because Webster accepted numerous checks marked "Agent Settlement" for payment at the rate of $25.00 per load on the Dole and Kroger accounts.

██ Both parties seek summary judgment on the defense of accord and satisfaction. Where, as here, we have cross motions for summary judgment, we must "assess the merits of each summary judgment motion independently." *Heder v. City of Two Rivers*, 149 F.Supp.2d 677, 683 (E.D.Wis.2001); *see also Hendricks–Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir.1998) (where plaintiffs lost in court below, analyzing defendant's motion for summary judgment as if it had been the only motion in district court). We set forth the relevant facts and case law and then apply the standard for summary judgment first to Defendant's motion and then to Plaintiff's.

██ As noted above, cashing a check in an amount less than the disputed amount can constitute accord and satisfaction under certain conditions. *See Mominee*, 629 N.E.2d at 1283. The question here is whether these conditions have been met. In Indiana, "a check tendered in satisfaction of a claim must be accompanied by an express condition that the acceptance is in full satisfaction of the claim and that the creditor takes the check subject to that condition." *Id.* "In lieu of an express condition, the circumstances must clearly indicate *to the creditor* that this condition is present." *Rauch v. Shots*, 533 N.E.2d 193, 194 (Ind.Ct.App.1989) (citation omitted) (emphasis in original). Courts look to the intent of both parties in offering and accepting the checks to determine if there has been accord and satisfaction. *Id.* at 195.

We first note that Webster's claim is unliquidated despite its argument to the contrary. Plaintiff's Response to Defendant's Motion at 4. Webster argues that its

---

7. While Plaintiff also claims that it was underpaid on the Fresh America account, Defendant does not assert an accord and satisfaction defense with respect to that account, apparently because IWX regards the disputed amount on the Fresh America account as "nominal." Defendant's Facts, ¶ 3 n. 1.

Plaintiff also requests payment at the rates set forth in the Commission Agreement on loads shipped for Wal-Mart. Because Plaintiff has not been paid any amount for any of these loads, Plaintiff's Facts, ¶ 39, the defense of accord and satisfaction is inapplicable.

claims for payment on the Kroger and Dole loads are liquidated because the Commission Agreement governs the rate per load, thereby making the amount due a matter of simple multiplication. *Id.* at 4–5 (citing 1 Am.Jur.2d *Accord and Satisfaction* § 7, at 474 (1994)). In *Daube and Cord v. LaPorte County Farm Bureau Co-op. Ass'n,* 454 N.E.2d 891, 894 (Ind.Ct. App.1983), the defendant had paid plaintiff the exact amount owed on petroleum products and then claimed accord and satisfaction when the plaintiff sued for the amount owed for animal feed. The court rejected the defendant's argument, finding that the claim for animal feed sales was liquidated making accord and satisfaction inapplicable. *Id.* The situation here would be analogous if Defendant had paid Webster the exact amount due on the Kroger loads and then claimed accord and satisfaction when Plaintiff sued for payment on the Dole loads. Instead, the parties' argument concerns whether any of the loads were governed by the Commission Agreement, making possible the defense of accord and satisfaction. *Cf. Gearhart,* 393 N.E.2d at 259–60 (finding claim unliquidated when parties disputed meaning of term in contract governing their commission-based business relationship). On this basis, Plaintiff cannot defeat Defendant's motion for summary judgment.

Whether there is a genuine issue of material fact concerning the presence of an express condition is the next question before the Court. The classic example of an express condition is a straightforward writing on the check, stating, for example, "Balance on Commission Payment in full." *Mominee,* 629 N.E.2d at 1283 (finding such statement an express condition when written on check tendered immediately after parties discussed disputed commissions). For Webster to survive summary judgment, it need only present evidence raising a genuine issue of material fact as to whether IWX expressly conditioned ac-

ceptance of the checks as acceptance of full payment on the Dole and Kroger loads. Webster meets this burden. The parties agree that each check stated "Agent Settlement" and was accompanied by a sheet itemizing the loads reflected in the check. Plaintiff's Facts, ¶ 28. These writings are not the model of clarity envisioned by the law of accord and satisfaction.

Furthermore, these writings are so ambiguous that IWX cannot defeat Plaintiff's summary judgment motion with the argument that there was an express condition. When deciding questions of accord and satisfaction, Indiana courts reject language more specific than that at issue here. In *Tabani v. Hester,* 174 Ind.App. 56, 366 N.E.2d 193, 194 (Ind.Ct.App.1977), the defendant sent the plaintiff a check and a letter stating that the amount was the largest the defendant would willingly pay and that the defendant considered the sum "a fair and equitable conclusion" of plaintiff's claims. Although these statements explain the defendant's position regarding the dispute, the *Tabani* court found that these statements did not constitute an express condition. *Id.* The phrase "Agent Settlement" and the itemization sheets sent with the checks fail to offer an explanation of or even a reference to the dispute over commissions, and they cannot raise a genuine issue of material fact that Defendant expressly conditioned acceptance of the checks as payment in full. Defendant does not offer any evidence that other writings which would constitute an express condition were included with or on the checks. Hence, on the basis of express condition, IWX cannot survive Plaintiff's motion for summary judgment.

In the absence of an express condition, we next look to "whether the parties intended the draft to constitute accord and satisfaction of all claims ... or at least whether the circumstances should have

clearly indicated to [Webster] that the condition was present." *Rauch,* 533 N.E.2d at 195. Because the crucial element here is intent, a party seeking summary judgment faces a particularly high hurdle. In *Tabani,* 366 N.E.2d at 195, the court reversed summary judgment for the defendant, explaining that "[w]ithout an express condition being shown in the instruments, an accord and satisfaction may be implied, but only upon a showing of the subjective intent of the party to be bound. If, as here, the intent of the parties is in dispute or is ambiguous, the question is to be presented to the trier of fact for its determination." Indiana courts caution that accord and satisfaction should be treated as a question of law only in rare circumstances. *E.g., Rauch,* 533 N.E.2d at 194 ("The issue of accord and satisfaction is ordinarily a question of fact and becomes one of law only if the requisite controlling facts are undisputed and clear."). *Fifth Third Bank,* 629 N.E.2d at 1249, is one of the rare cases where an appeals court approved treating accord and satisfaction as an issue of law. In this case, the court found that a bankruptcy reorganization plan was not an agreement with defendant farm supply company because the farm supply company had not been before the bankruptcy court. *Id.* Without an agreement between the same parties, the *Fifth Third Bank* court noted, there could not be accord and satisfaction. *Id.*

Keeping in mind the difficulty of winning a summary judgment motion when intent is at issue, we turn to the parties' arguments. In order to defeat IWX's motion for summary judgment, Webster need only raise a genuine issue of material fact concerning the intent of either party. Plaintiff easily clears this hurdle. In his deposition, Coulter was asked "if each and every check he [Don Webster] receives with regard to the commission payments from 1995 on, if they each bear the word 'Agent Settlement,' that doesn't mean that there has been any kind of discussion between you or IWX and Don Webster as to the amount of that check?". Coulter Depo. at 121. Coulter replied, "Not that I know of." *Id.* He also stated that the term "Agent Settlement" on the check was not "significant verbiage." *Id.* Through Coulter's testimony, a jury could readily conclude that IWX lacked the requisite intent when tendering the checks. On this basis, Defendant's motion cannot be granted.

█  Plaintiff's motion for summary judgment on this issue [8] requires considerably more examination. Webster's presentation of facts suggests "that there is an absence of evidence to support the non-moving party's case" that IWX tendered the checks with the intent that acceptance signify agreement that the checks constitute payment in full. *See Celotex Corp.,* 477 U.S. at 323, 325, 106 S.Ct. 2548. As noted above, Coulter testified that the writings on the checks and on the accompanying calculations had no particular significance. Coulter Depo. at 121. In addition, Webster submits the deposition testimony of Lori Mitchell, a sales assistant at IWX, who testified that she prepared agent settlement statements for Don Webster and three or four other agents. Mitchell Depo. at 15–18.[9] In her

---

**8.** That Webster is seeking summary judgment on Defendant's affirmative defense is not as unusual as it may appear. *EEOC v. Admiral Maintenance Service, L.P.,* 1998 WL 102748, at *1 (N.D.Ill. Feb.26, 1998) ("[J]udges of this court routinely entertain motions for partial summary judgment seeking the dismissal of affirmative defenses.") (citation omitted).

**9.** Plaintiff failed to include a copy of the deposition transcript of Lori Mitchell. However, Defendant agreed with Plaintiff's statement of material facts with regard to her deposition testimony. Defendant's Reply to Plaintiff's Facts in Response to Defendant's Motion for Partial Summary Judgment at ¶¶ 24–26.

deposition, Mitchell stated that there was nothing unique about the agent settlement statements or checks prepared for Webster as compared to other agents. *Id.* Coulter's and Mitchell's business-as-usual approach to the checks and settlement sheets issued to Webster creates a strong inference that IWX lacked the intent that accepting the checks would constitute accord and satisfaction.

Defendant rebuts this inference by introducing the affidavit of Norman Bodine, the comptroller at IWX. Bodine Aff., ¶¶ 1–2. In his affidavit, Bodine avers that one of his duties was to issue weekly settlement checks to commission sales agents such as Webster. *Id.* ¶ 3. He further states that "[t]he words 'Agent Settlement' on Webster's checks and the accompanying settlement sheets were intended by IWX to make known to Webster that the checks were tendered in full satisfaction of the amounts due and owing for the respective loads." *Id.* ¶ 6. If Defendant were attempting to raise a genuine issue of material fact concerning anything other than intent, Bodine's self-serving affidavit would not suffice.[10] Instead, it barely clears the hurdle of establishing more than a "mere scintilla of evidence in support of the [defendant's] position." *Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. 2505.

"In this circuit, a party may avoid summary judgment by submitting an affidavit that conflicts with its earlier deposition testimony only in a limited number of circumstances." *Adelman–Tremblay v. Jewel Companies, Inc.,* 859 F.2d 517, 520 (7th Cir.1988). "A subsequent affidavit may be used to clarify ambiguous or confusing deposition testimony, or it may be based on newly discovered evidence." *Slowiak v. Land O'Lakes, Inc.,* 987 F.2d 1293, 1297 (7th Cir.1993). Defendant makes no argument that IWX only recently discovered Bodine's evidence, but it appears that Bodine's affidavit arguably clarifies the testimony of Coulter and Mitchell. Both Coulter and Mitchell testify that checks and settlement sheets were issued to Webster without any special intent on the part of IWX, but nothing establishes that Coulter and Mitchell were privy to the intent of every IWX employee involved in issuing the payments. Bodine, as comptroller, avers that he played some role in issuing checks to commission sales agents like Webster and that IWX truly did offer these checks on the condition that acceptance would constitute accord and satisfaction. Even in the face of testimony from Coulter and Mitchell, a reasonable jury could decide to credit Bodine's testimony.[11] The case at bar differs from *Fifth Third Bank,* 629 N.E.2d at 1249, where no argument could be made that the operation of federal law in creating a bankruptcy reorganization plan between creditor and debtor was actually an agreement with a third party who was the defendant before the court. Here, unlike in *Fifth Third Bank,* intent cannot be transformed into a ques-

---

10. The Court is aware of the suspicion with which the Seventh Circuit routinely regards "self-serving affidavits without factual support in the record" when deciding motions for summary judgment. *Albiero v. City of Kankakee,* 246 F.3d 927, 933 (7th Cir.2001). However, we also recognize the difficulty of "recount[ing] factual instances, based upon ... personal knowledge," that demonstrate something as intangible as intent. *See Drake v. Minnesota Mining & Manufacturing Co.,* 134 F.3d 878, 887 (7th Cir.1998).

11. The Court feels compelled to express its skepticism that any reasonable jury would do so, however, especially in light of the wording of Bodine's affidavit. Bodine states that somehow the checks "were intended by IWX" to satisfy accord and satisfaction. He does not state that *he* had the requisite intent in overseeing the issuance of the checks and settlement sheets. Such indirection does not normally instill confidence in fact-finders.

tion of law. Because the Court cannot conclude as a matter of law that IWX lacked the requisite intent, Defendant survives Plaintiff's motion for summary judgment on this basis.

Because accord and satisfaction rests on the notion that the parties reached and performed a new agreement, the intent of both parties is at issue. *Rauch,* 533 N.E.2d at 194 (examining testimony from both payor and payee of check concerning their respective intentions with regard to the issuance and acceptance of the check at issue). Hence, if IWX can raise a genuine issue of material fact concerning Webster's intent in endorsing the check, IWX will survive Plaintiff's motion for summary judgment on this basis also. Defendant argues that, from the conversations between Coulter and Don Webster at the IWX open house and at the September 1997 meeting between the two parties, Don Webster knew that his right to be paid the rates set forth in the Commission Agreement was disputed by IWX. Reply Brief in Support of Defendant's Motion for Partial Summary Judgment at 2–3. As such, according to Defendant, Webster's act of depositing the checks for payment at a lower rate indicates that Webster understood and agreed to the reduced rate, as required for accord and satisfaction. *Id.* at 3. In *Armour & Co. v. Anderson,* 114 Ind.App. 485, 51 N.E.2d 496, 497 (1943), the Indiana Court of Appeals held that where the plaintiff had accepted checks for lower payment for more than six years, the plaintiff understood and agreed to the defendant's conditions. As Plaintiff correctly notes, in *Armour,* 51 N.E.2d at 497, the new rate had been clearly set forth in a letter to the plaintiff, in contrast to the case before us where vague terms possibly were discussed at the IWX open house. Plaintiff's Resp. to Defendant's Motion for Partial Summary Judgment at 17–18. However, here, as in *Armour,* the new rate was clearly set forth in the settlement

statements accompanying the checks, creating a genuine issue of material fact that Don Webster understood and accepted the new terms offered by IWX.

Plaintiff responds by arguing that Don Webster did not intend to accept the checks as full satisfaction for his claims as evidenced by the fact that he frequently voiced his complaints about the reduced commission rates to Coulter and other employees at IWX. Plaintiff's Resp. to Defendant's Motion for Partial Summary Judgment at 8. While the exact number and the nature of such complaints is in dispute, the parties agree that at least some complaints were made. Plaintiff's Facts in Response to Defendant's Motion for Partial Summary Judgment, ¶ 20. However, objecting to the terms on which the checks arguably were offered cannot establish as a matter of law that Don Webster lacked the intent required for accord and satisfaction. In *Mominee,* 629 N.E.2d at 1281–82, the plaintiff clearly indicated his objection to an express condition of accord and satisfaction, but the court found that, in the face of evidence that the plaintiff understood the terms on which the check was offered, his objection could not defeat accord and satisfaction. The *Mominee* court reasoned that "[w]hen defendant presented the check with a condition attached, King could either accept or reject the check on it terms, *but he could not obtain the benefits of the check without also accepting its burdens." Id.* at 1284 (emphasis added). Whether Don Webster understood the intent with which the checks may have been offered is a question for the jury since Don Webster's objections, as a matter of law, cannot establish that he lacked the intent required to constitute accord and satisfaction. For the above reasons, Plaintiff is not entitled to summary judgment on the issue of accord and satisfaction.

*Defense of Release*

Webster sues IWX for payment under the terms of the Commission Agreement on a number of volume accounts, including the Kroger, Dole, Fresh America and Wal–Mart accounts. The parties agree that Webster was paid for at least some of the loads in these accounts at a rate well short of the rates set forth in the Commission Agreement of $50.00 per load on winter loads and $100.00 per load on summer loads. *See, e.g.,* Plaintiff's Facts, ¶¶ 27, 41. In its answer to the Amended Complaint, IWX claims the affirmative defense of release. Answer, ¶ II, 6. Specifically, IWX asserts that "Don Webster agreed to provide services on behalf of Defendant under terms different than those contained in the [Commission] Agreement. . . ." Defendant's Answer to Interrogatory ¶ 20. Plaintiff asks for summary judgment dismissing this defense.[12]

■■■ Release is "the act of giving up a right or claim to the person against whom it could have been enforced." *Black's Law Dictionary* 1292 (7th ed.1999). In Indiana, the rules governing the construction of contracts also govern the construction of releases. *Plumlee v. Monroe Guaranty Ins. Co.,* 655 N.E.2d 350, 357 (Ind.Ct.App.1995) (applying contract rules to release to determine that defendant was not a party to release); *cf. Carona v. Illinois Central Gulf Railroad Co.,* 203 Ill.App.3d 947, 148 Ill.Dec. 933, 561 N.E.2d 239, 242 (1990) ("A release is a contract wherein a party relinquishes a claim to a person against whom the claim exists, and a release is subject to the rules governing the construction of contracts.") (citation omitted). Based on the principles of contract construction, Webster argues that there was no release because any agreement (other than the Commission Agreement) reached between the parties was not sufficiently definite in its terms to constitute a valid and enforceable contract releasing IWX from the Commission Agreement. Plaintiff's Brief at 9–10. If Defendant cannot create a genuine issue of material fact that there was an agreement with reasonably certain terms constituting a release, then Webster is entitled to summary judgment on this issue.

■■■ Under Indiana law, in order to be valid and enforceable, a contract must be reasonably definite and certain in its terms. *International Shoe Co. v. Lacy,* 114 Ind.App. 641, 53 N.E.2d 636 (1944). Terms such as the price for the work, the nature of the work, and the time in which the work was to be completed should be stated clearly in the agreement. *Marshall v. Ahrendt,* 165 Ind.App. 359, 332 N.E.2d 223, 225 (1975). Defendant points to only one instance as the setting in which the parties reached an agreement on these accounts establishing a commission rate lower than the rates in the Commission Agreement. IWX argues that, at the IWX open house held in the spring of 1996, Coulter and Don Webster made an oral contract establishing new terms of compensation for any high volume customers brought in by Webster. Defendant's Resp. at 5–6.

Contrary to Defendant's argument, Coulter's own testimony about the conversation between Coulter and Don Webster at that event establishes as a matter of law that any agreement reached between the parties is too indefinite to constitute a binding contract. In his deposition, Coulter stated:

"Well, when we had our meeting at the open house in the spring of '96, we pretty much hashed that program out,

---

12. As noted above, courts "routinely entertain motions for partial summary judgment seeking the dismissal of affirmative defenses."

*EEOC v. Admiral Maintenance,* 1998 WL 102748, at *1.

and Don left there understanding that on a volume account, *something like this, something around like $25.00 a load, whether it's going to be a per load or a percentage or something, but some level of compensation like that would be what he would receive.*" Coulter Depo. at 75 lines 10–17 (emphasis added). This quote demonstrates that the parties did not set a definite price for Webster's services, which is a crucial term for creating a valid, enforceable contract.

▆▆▆ In an effort to downplay the significance of the indefiniteness of the terms of the parties' oral agreement, Defendant suggests that there was a release because the parties agreed "that the terms of the existing Agreement would not work on the new volume accounts." Defendant's Resp. at 4. Assuming, as we must for the purposes of this motion, that Webster attended the open house, the evidence certainly bears out Defendant's claim that, at the IWX open house, Coulter and Don Webster agreed to consider different terms for volume accounts because of Coulter's objection to the then-current rates. In addition to the above-quoted deposition testimony concerning discussions about volume accounts at the IWX open house, Coulter also stated:

> When Don came to the open house, which we decided was in the spring of '96, we agreed then that if he was going to participate in any volume accounts, it would be under a different contractual arrangement, agreement, whatever, than his previous relationship had been with IWX.

Coulter Depo. at 73, lines 7–15. Taking Coulter's deposition testimony as true,

which we must do at this juncture, it is clear that the parties agreed that volume accounts were open to renegotiation.[13] However, an "agreement to agree" is not a contract and cannot constitute release. As the Supreme Court of Indiana notes, "If the document or [oral] contract that the parties agree to make is to contain any material term that is not already agreed on, no contract has yet been made; the so-called 'contract to make a contract' is not a contract at all." *Wolvos v. Meyer*, 668 N.E.2d 671, 675 (Ind.1996) (citation omitted). Defendant cannot establish a genuine issue of material fact that there was a release by showing that the parties agreed to open negotiations for certain types of contracts. Plaintiff is entitled to summary judgment dismissing the defense of release.

*Defense of Payment*

With regard to Webster's claim for payment under the terms of the Commission Agreement on various accounts, Defendant also asserts the defense of payment.[14] Answer, ¶ II, 5. IWX argues that "[t]he facts support [its] payment defense as IWX has paid the amounts agreed to be due and owing pursuant to either a modification of the Agreement or a new oral contract." Defendant's Resp. at 8. Once again, Defendant claims that the conversation between Coulter and Webster at the IWX open house constitutes a contract for volume accounts. *Id.* at 9. For the same reason dispositive to the release defense-that the terms are not definite and certain so as to be a valid and enforceable contract-Defendant's payment defense fails. Plaintiff's

---

13. Indeed, the parties later set different terms for certain volume accounts which are not in dispute here. *E.g.*, Plaintiff's Facts, ¶¶ 19–20 (describing contracts establishing commission rate of $25.00 per load on account with The Gap and later changing rate to 2½ ¢ per mile).

14. Because Plaintiff was not paid for the Wal–Mart account, this defense is not relevant to Webster's claims for Wal–Mart loads.

motion for summary judgment dismissing the defense of payment must be granted.

*Conclusion*

For the reasons explained above, Plaintiff's Motion for Partial Summary Judgment is *DENIED* with respect to the defense of accord and satisfaction and *GRANTED* with respect to the defenses of release and payment. Defendant's Motion for Partial Summary Judgment is *DE-NIED*. Also, Defendant's Motion to Strike is *DENIED*.

It is so ORDERED this —— day of August 2001.